IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 3, 2019

## MICHAEL JOHN STITTS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-18-283       Roy B. Morgan, Jr., Judge**

_____

### No. W2019-00867-CCA-R3-PC
_____

The Petitioner was convicted by a Madison County jury of attempted first-degree murder, aggravated assault, aggravated burglary, and employing a firearm during the commission of a dangerous felony, for which he received an effective sentence of sixty-one years' imprisonment. State v. Michael John Stitts, No. W2017-00209-CCA-R3-CD, 2018 WL 2065043, at *1 (Tenn. Crim. App. Apr. 27, 2018), appeal denied (Aug. 8, 2018). After his convictions were affirmed by this Court, the Petitioner filed a petition for post-conviction relief alleging ineffective assistance of trial counsel based on various grounds, which was denied following a hearing. In this appeal, the Petitioner raises the same issues and contends that trial counsel was ineffective in (1) failing to conduct a proper investigation into the facts of the case; (2) failing to object to improper witness testimony; (3) failing to adequately cross-examine witnesses; (4) failing to file certain pre-trial motions; and (5) failing to ensure juror impartiality. Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the Petitioner, Michael John Stitts.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Jody Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

On April 6, 2015, the Petitioner shot the victim, Mary Ann Greer, his ex-girlfriend, once in her chest and once in her shoulder. Michael John Stitts, 2018 WL 2065043, at *1. As a result of her gunshot wounds, the victim had fifteen surgeries, and her arm was amputated. She was hospitalized from April until August of 2015, and she suffered a stroke between the attack and trial. Her vision also had worsened since the attack, but she did not know if that was related to her injuries. The victim testified at trial that while she was at her new boyfriend's home, the Petitioner came to the door and broke into the home. She called 9-1-1, and portions of the shooting were captured on the call's recording. Officers arrived shortly after the call and arrested the Petitioner on the scene. Id. at 2. A .28-gauge shotgun was observed lying on the ground within five to six feet of the Petitioner, smelled of fresh gunpowder, and appeared to have been recently fired. Each responding officer testified that the barrel of the gun was bent and had dirt inside it. While being transported and without being asked any questions, the Petitioner told one of the officers that he had taken the shotgun from someone's house and that the owner of the gun was asleep and did not know he had taken it. Id. The Petitioner provided the address of the home from which he took the gun, which was approximately one quarter to one half of a mile from the crime scene. The admitted video evidence reflected the Petitioner's statements. The transporting officer testified that the Petitioner appeared anxious before the victim was found, but once he was transported away from the crime scene, he was calm and did not appear to be under the influence of any drug or intoxicant. Id.

Once at the police station, the Petitioner signed a written confession, which he later recanted. Michael John Stitts, 2018 WL 2065043, at * 3. The primary investigator testified that the Petitioner appeared of clear mind and had normal behavior when giving his typewritten statement. The Petitioner was also described as "very alert" and "normal" during this interview. Id. The Petitioner's statement of admission provided as follows:

> Last night I was up all night. I have not been able to sleep since I got out of jail. I was in a relationship with [the victim] for 5 years before I was locked up. She stayed in contact with me the first year and a half but then she stopped talking to me. I wanted to have my family back and I paid her phone bill when I first got out of jail so we could talk. I wanted to check on her and the grandkids. I did everything I could to take care of her. This morning I went over to her friend's house and knocked on the door. Nobody would answer the door so I shot it. After I shot it I walked around the side of the house to see if I could hear anyone inside. I heard someone moving inside so I went around back and pulled the air conditioner out of the window. I crawled through the window and went inside the house.

Someone was in the bathroom and had the door closed. They would not open the bathroom door so I shot through it. I heard [the victim] sa[y] that she had been hit. I tried to open the door but she was up against it. I finally opened the door and we started to fight over the gun. She had the barrel and I had the bottom part. The gun went off when we were fighting over it. I did not know if she was hit but I saw blood. We w[ere] still fighting for the gun and I was able to get it away from her. I hit her with the barrel in her head or top half of her body. I left the bathroom and went through the window I came in. I did not intend to hurt [the victim]. I went over [to] the house to deal with the guy friend that she was dating. We had a car accident and my truck hit his in the rear. The brakes on my truck went out but he lied to the police and told them that I tried to run them off the road. I love [the victim] more than I love myself and wish that I could take what happened back. I feel like I was not myself, like the devil had me and was telling me what to do. [The victim] was at the wrong place at the wrong time. I took the gun from the house that I live in. They were sleeping and did not know about it. I got the shells from ... [Mr. Forrest's] truck. It was locked so I got the keys off the wall and opened the truck up.

Id.

The next day, the Petitioner asked to speak with investigators again and provided the following statement:

On April 6, 2015[,] I ... was arrested ... in a backyard next door to where [the victim] was shot[.] I'm not the shooter and I was in the backyard next door to pick up the shotgun and shells that John Forrest purchase[d] from me. Well he ... paid me $150.00 to bring him a shotgun around 12:30 a.m. on April 6, 2015. I was told by him to be back over there later to pick up the gun from the backyard by the air conditioner in [the] back of the house. I didn't go in the house[.] John Forrest knock[ed] the air conditioner out and the window out to make it seem[ ] like someone else done it. At 12:00 or 11:55 p.m. I spent my last $5.00 getting gas at Citgo gas station. I love [the victim] and her family but I wouldn't hurt her or her family. I will hurt myself before [I] hurt her or her family. Well y[']all can ask anybody about me and they will tell you [I]'m not that type of person to shoot and harm [the victim]. John Forrest left home[,] went to sign in at work but came back home and he left before the police came. He was wearing beige pants and a blue shirt like some work clothes. He probably did this because I said at the accident that [the victim] had [AIDS] and he need[ed] to get check[ed] out. I have [a] back problem and can't do any heavy lifting or climbing due to a bullet in my back close to my spine in my lower back.

> Well [I] didn't commit these charges [I']m accused of but will do all [I] can to help officers to arrest and convict this John Forrest the suspect who done this to [the victim]. He ... was driving a Chevy Blazer[,] maroon in color ... when he left [and] went back to work.

Micheal John Stitts, 2018 WL 2065043, at *4.

At trial, the Petitioner claimed that he was "involuntarily intoxicated" at the time of the offense. Micheal John Stitts, 2018 WL 2065043, at *5. He testified that he had been in a closed van with Mr. Phillip Taylor, whom the Petitioner claimed was smoking marijuana that was "laced" with "something." Id. Shortly thereafter, the Petitioner said he "just blanked out," and he did not recall going to see the victim. He testified further that he was "involuntarily intoxicated" and unaware of the circumstances during the police interview. He refuted his written statements to police.

Based on the above proof, the Petitioner was convicted of the aforementioned offenses, for which he received an effective sentence of sixty-one years' imprisonment.

At the post-conviction hearing, the Petitioner testified extensively and noted that he believed trial counsel was ineffective in failing to note inconsistencies in the victim's testimony either through cross-examination or his closing arguments, but the Petitioner was unable to give specific examples of statements that were inconsistent. To put the claim in context, the victim testified at trial that the Petitioner had been stalking her and wanted her to himself, however, the Petitioner believed that this was contrary to the rest of her testimony. He was also unable to articulate how this testimony was contradictory, but he insisted that trial counsel's failure to bring this information to the jury's attention was error. The Petitioner was also aggrieved that trial counsel failed to adequately challenge certain evidence against him. The Petitioner specifically noted that Mr. Mayo, with whom the Petitioner was living at the time of the offense, testified at trial that the Petitioner stole the shotgun and a box of ammunition that were used in the shooting from his house. The Petitioner pointed out that, according to Mr. Mayo, the box of ammunition was mixed with half long and half short shells. However, officers testified that they recovered a total of 25 shells from the Petitioner, the chamber of the gun, and the ground at the crime scene. For the box to be mixed half and half, the Petitioner opined the total must have been 24 since only even numbers can be divided in half. Based on this alleged discrepancy, the Petitioner believed that trial counsel was deficient in not raising the possibility of evidence fabrication.

The Petitioner also believed that trial counsel was deficient in failing to challenge the testimony surrounding the shotgun recovered from the crime scene. The Petitioner testified that officers at trial had described the shotgun's barrel as filled with mud.

- 4 -

According to the Petitioner, it did not rain until after he had been arrested, and therefore, the mud could only have gotten into the gun if the officers had planted the gun at the scene after his arrest. The Petitioner was also aggrieved because trial counsel failed to challenge the blood evidence recovered from his clothing. While the tests conducted by the Tennessee Bureau of Investigation (TBI) concluded that the blood samples recovered matched the victim's blood, the Petitioner believed trial counsel was ineffective in failing to test the samples to determine if they were human blood. Based on this, the Petitioner alleged that trial counsel was ineffective in failing to object to the DNA analysis. The Petitioner was further aggrieved because trial counsel failed to object to the testimony by TBI Agent Smith, which he believed was perjured. Agent Smith testified at trial that she was unable to perform both a fingerprint analysis and a DNA analysis of the gun due to technical limitations. However, the Petitioner claimed that TBI had conducted both fingerprint and DNA analysis on the same piece of evidence in other cases, and that Agent Smith's testimony must therefore be perjured. The Petitioner believed that trial counsel should have requested a mistrial or at the very least objected to Agent Smith's testimony.

The Petitioner testified further that trial counsel failed to engage in a meaningful investigation of the crime. The Petitioner testified that trial counsel failed to physically investigate the scene of the crime. Had trial counsel visited the scene, he would have learned more about the layout of the house, how the Petitioner allegedly gained access to the house, and met potential witnesses. The Petitioner testified that this lack of investigation demonstrated a general lack of commitment to his defense. The Petitioner testified that he requested trial counsel pursue a defense strategy of involuntary intoxication. According to the Petitioner, he and Mr. Taylor were talking in Taylor's van when Taylor started to smoke marijuana. The Petitioner refused to smoke as well, but the van was closed off and the smoke affected him regardless. He reported to trial counsel that he "wasn't feeling [himself]" as a result of the smoke and believed the marijuana must have been laced with some other substance such as angel dust--a common name for Phencyclidine or PCP. Although trial counsel argued involuntary intoxication during trial, and the trial court instructed the jury on involuntary intoxication, the Petitioner believed that it was error for trial counsel not to question Mr. Taylor.

The Petitioner testified that trial counsel failed to cross-examine witnesses effectively. The victim identified the Petitioner at trial, but was unable to read a written statement that she had given to police earlier in the investigation. The Petitioner believed it was ineffective for trial counsel to allow this testimony without a more exacting cross-examination. Similarly, the Petitioner was aggrieved that trial counsel did not object to the testimony of a 9-1-1 operator. Ms. Jernigan, a 9-1-1 operator, testified at trial and authenticated a recording of the victim's 9-1-1 call. The Petitioner believed that trial counsel should have objected to her testimony because she was not working the night of

- 5 -

the shooting, had no direct knowledge of the recording's content, and therefore should not have been allowed to testify.

The Petitioner then challenged trial counsel's failure to file pre-trial motions. Trial counsel did not file a bill of particulars, and he did not provide certain electronic records to the Petitioner during discovery. Trial counsel also did not move for a change of venue. According to the Petitioner, his picture and story were featured in a mayoral campaign advertisement. The advertisement claimed that the opposing candidate, as a criminal defense attorney, worked to get criminals like the Petitioner out of jail and on the streets. The Petitioner was aggrieved because trial counsel never asked members of the jury if they had seen this commercial, and he did not move for a change of venue. Similarly, the Petitioner believed that trial counsel was deficient because he did not question the jury if their impartiality had been affected after members of the gallery came to court wearing matching shirts in solidarity with victims of domestic violence.

The Petitioner also testified that trial counsel failed to request a psychiatric examination to support his claim of involuntary intoxication. He acknowledged that his prior counsel had an examination performed, but he complained that the examination did not investigate the possibility of involuntary intoxication. The Petitioner also noted that trial counsel did not request a blood-spatter expert to examine the crime scene and the Petitioner's clothing, despite the Petitioner's requests for an examination. The Petitioner testified that trial counsel failed to make necessary objections during the State's closing argument. In support of this claim, the Petitioner pointed out that the State characterized the shooting as being at close range, but the victim testified she was shot through the bathroom door. The State also argued that the victim was struck in the head with the shotgun, however, the Petitioner stated that the victim did not testify to this fact. Overall, the Petitioner believed that trial counsel was ineffective in allowing this mischaracterization of the evidence without objection.

Finally, the Petitioner raised several miscellaneous objections to trial counsel's performance. The Petitioner testified that trial counsel did not try to secure a plea agreement after the Petitioner rejected the first plea offer. He claimed that trial counsel failed to properly investigate by failing to ask if the Petitioner had a girlfriend at the time who might serve as a rebuttal witness. The Petitioner advised trial counsel that a friend of the Petitioner's knew a juror through extended family and marriage, but trial counsel did not follow up on this connection. The Petitioner concluded his testimony with various factual allegations that were litigated at trial, including testimony that Mr. Taylor had stolen his recently purchased Chevy Impala.

Mr. Benjamin Beasley testified that he had known the Petitioner for many years and was in contact with him in the days leading up to the shooting. Beasley recalled

going with the Petitioner to buy a white, 2002 Chevy Impala the day before the shooting. Beasley was not called as a witness and would have testified to witnessing the purchase had he been called. Ms. Patricia Anderson, the Petitioner's sister, also testified on behalf of the Petitioner. She recalled seeing mayoral campaign advertisements labeling the Petitioner as a hardened criminal. She was unsure how many times she had seen the commercial, but she testified that it was multiple times. She remembered having a conversation with the victim after the shooting and characterized her interaction as "normal." Ms. Anderson testified that she knew the Petitioner had a girlfriend at the time of the shooting. Mr. Bobby Anderson, the Petitioner's brother-in-law, testified that he did not recall seeing any commercials or other media related to the Petitioner's trial. Mr. Anderson knew the victim prior to the shooting and testified that she seemed "normal" after the shooting. Mr. Anderson contradicted Ms. Anderson's testimony and testified that the Petitioner was "[j]ust friends" with his alleged girlfriend.

Trial counsel testified that he was a current employee of the Memphis Federal Defender's Office and was in private practice at the time of the Petitioner's trial. He testified that he had nine years of criminal law experience at the time of the Petitioner's trial. Trial counsel was appointed to represent the Petitioner after the public defender withdrew from representation. Trial counsel testified that he did not file for a bill of particulars because the prosecutor's office had an open file discovery process that made a bill of particulars redundant. Trial counsel met with the Petitioner eight to ten times prior to trial and discussed trial strategy with him at length. He did not vigorously pursue a second plea agreement after the Petitioner rejected the first offer because the State made it clear that they wanted to go to trial. Trial counsel testified that he did not request a mental evaluation of the Petitioner because the public defender had already had one conducted, and he did not see a reason that would justify a second evaluation.

Trial counsel recalled that the State's evidence was strong, and so he adopted strategy for the defense to inject reasonable doubt into the State's case rather than offer an alternative narrative. Trial counsel cross-examined the State's witnesses as best he could but was not surprised at the strength of the State's evidence. Trial counsel filed a motion for a new trial and preserved for appeal all of the potential issues he could identify. Trial counsel filed every motion that he believed was meritorious and allowed the Petitioner to make oral argument to the trial court on the motions he was unwilling to file. Trial counsel recalled the Petitioner telling him about a political advertisement that may have biased the jury against him, but he was unable to locate evidence of the ad. Trial counsel testified that did not interview Mr. Taylor about involuntary intoxication because the public defender's office had previously spoken with Taylor, who denied that he drugged the Petitioner and claimed that the Petitioner had been violent towards previous girlfriends. Trial counsel expected that this testimony would be more damaging than helpful to the defense.

The post-conviction court denied relief by written order finding that the Petitioner's testimony was not credible and was "mere speculation when compared to the record from the underlying trial." The post-conviction court specifically found that trial counsel's representation "did not fall below the acceptable standard of care" and that any errors that trial counsel may have committed would not have affected the outcome of the trial. It is from this order that the Petitioner timely appeals.

## ANALYSIS

On appeal, the Petitioner argues that he received ineffective assistance of counsel when trial counsel: (1) failed to conduct a proper investigation into the facts of the case; (2) failed to object to improper witness testimony; (3) failed to adequately cross-examine witnesses; (4) failed to file certain pre-trial motions; and (5) failed to ensure juror impartiality. In response, the State argues that trial counsel's representation was not deficient, and that any perceived deficiency did not negatively impact the trial. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**Failure to Conduct a Proper Investigation**. First, the Petitioner argues that trial counsel was ineffective for failing to conduct a proper investigation. To support this

claim, the Petitioner cites several instances where he believes trial counsel failed to adequately investigate. The Petitioner claims that trial counsel was deficient for failing to notice a discrepancy in the number of shotgun shells recovered from the crime scene and the number of shells that the owner of the gun testified that he owned. He also claims that trial counsel failed to investigate the fact that mud was found in the barrel of the shotgun, even though it did not rain until after he had been arrested. He noted that trial counsel made no effort to test the gun for fingerprints, and trial counsel did not have the blood evidence tested to ensure that it was human blood. He claims that trial counsel did not hire experts in in blood-spatter analysis or forensic toxicology. Finally, the Petitioner claims trial counsel was deficient for failing to investigate the crime scene or to interview Mr. Taylor about the drugs he had used in the time leading up to the shooting.

The Petitioner has failed to demonstrate how these alleged failures fell "below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369. Trial counsel's testimony at the post-conviction hearing, which was accredited by the post-conviction court, showed that he had conducted a thorough investigation of the facts and prepared a defense to the best of his ability. Additionally, the Petitioner has not shown what testimony additional witnesses would have been able to provide, see Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), and he has failed to show how trial counsel's alleged errors impacted the results of trial. Accordingly, the Petitioner is not entitled to relief.

**Failure to Object to Improper Witness Testimony.** The Petitioner alleges that trial counsel failed to object to improper witness testimony. Specifically, the Petitioner argues that it was error not to object to TBI Agent Smith's statement that it was impossible to collect fingerprints and DNA from the same source, to Ms. Jernigan's testimony authenticating the victim's 9-1-1 call, and to the State's closing statements. As to this issue, the Petitioner has failed to establish deficient performance or prejudice to his case. Agent Smith, an expert in DNA analysis, testified that she was unable to perform both tests on the shotgun. The cases that the Petitioner introduced showing both DNA analysis and fingerprinting overlooked the fact that the testing at issue was performed on different pieces of evidence. [II, 173]. Nothing in the record intimates that Agent Smith had perjured herself, and the Petitioner failed to provide testimony at the post-conviction hearing that would have substantiated the claim. In regard to the admissibility of the 9-1-1 operator's testimony, the record shows that she acted as the keeper of the records at trial. Her testimony was admitted to authenticate the veracity of the recording. See Tenn. R. Evid. 803.

Finally, the Petitioner alleges that trial counsel was deficient in failing to object to several of the State's closing remarks. He alleges that the State mischaracterized the evidence in its closing argument by claiming that the victim was shot at close range and

- 10 -

was beaten with the gun. Both of these statements are supported by the record. The victim suffered two gunshot wounds, one from a shot through the bathroom door, and a second after the Petitioner entered the bathroom. Both wounds could be fairly interpreted as close-range, even though one was partially blocked by the door. Similarly, while the victim did not testify to being beaten with the gun, the Petitioner's initial confession admits to it. While the Petitioner recanted the confession, the jury was free to disregard his recantation. Since both statements were supported by evidence in the record, trial counsel was not deficient in failing to object to them, and the Petitioner was not prejudiced. The Petitioner is not entitled to relief.

**Failure to Adequately Cross-Examine Witnesses.** The Petitioner alleges that trial counsel was ineffective for failing to thoroughly cross-examine the victim. At trial, the victim was able to positively identify the Petitioner from across the room, but was unable to read a document that was given to her by trial counsel. Additionally, the victim testified that the Petitioner was stalking her and had said, "If [the Petitioner] can't have [the victim], ain't nobody else going to have [her]…" The Petitioner alleges that other witnesses were willing to testify that he had moved on romantically and begun dating someone else, and that it was deficient for trial counsel to fail to impeach the victim with their testimony. The Petitioner argues that the victim's inability to read her prior statement implies that she should not be able to recognize the Petitioner. As to this issue, the record shows that the victim and the Petitioner had been in a long-term relationship, and identity was not at issue. Moreover, the severity and direction that a trial attorney cross-examines a witness is a matter of strategy, and as such, this Court must be highly deferential to trial attorneys' decisions. Goad, 938 S.W.2d at 369; Hellard v. State, 629 S.W.2d 4, 11 (Tenn. 1982). Trial counsel's decision not to aggressively cross-examine a sympathetic victim about the disability she suffered as a result of a shooting was reasonable. We similarly conclude that trial counsel made a strategic decision in not attempting to impeach the victim by arguing that the Defendant had moved on to a new girlfriend. The victim testified that the Petitioner had been stalking her and taking violent actions against her. The victim's testimony was corroborated by her boyfriend and police reports. The Petitioner's dating someone else at the time does nothing to refute these claims. The decision of trial counsel to focus the defense strategy on more relevant aspects of the case was reasoned and strategic, and therefore not deficient. The Petitioner is not entitled to relief.

**Failure to File Pre-Trial Motions.** The Petitioner argues that trial counsel was deficient in failing to move for a change of venue. According to the Petitioner, his photograph and prior conviction were used in a television ad in a mayoral election. In the ad, one of the candidates referred to the Petitioner as a hardened criminal. The Petitioner's sister testified at the post-conviction trial that she had seen the ad multiple times. According to the Petitioner, trial counsel was deficient for failing to move for a

change of venue since the ad prejudiced the jury pool against him. Trial counsel testified at the post-conviction hearing that he had looked for the ad in question, but was unable to find it. The Petitioner did not introduce the ad at the post-conviction hearing, and he failed to present any evidence that a member of the jury had seen the ad. Black v. State, 794 S.W.2d at 757. Accordingly, the Petitioner is not entitled to relief.

**Failure to Ensure Juror Impartiality.** Finally, the Petitioner argues that trial counsel was ineffective in failing to ensure that the jury pool was impartial. The Petitioner claims that trial counsel did not ask members of the pool about the effect that the disparaging mayoral ad may have had on their opinion of the Petitioner. He also claims that trial counsel was deficient for failing to object to the victim's family wearing domestic abuse support shirts. As to this issue, the Petitioner claims that the victim's family came to trial wearing matching purple domestic abuse t-shirts. The record on appeal includes sections of the voir dire proceedings, but it does not include a transcript of what objections trial counsel made, or what the trial court ruled regarding the shirts. According to the Petitioner's testimony at the post-conviction hearing, trial counsel objected to the shirts, and the trial court ordered the victim's family to turn them inside out so that the words could not be read. We note that the Petitioner bears the burden of providing a complete record on appeal. See State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1998) (citing State v. Groseclose, 615 S.W.2d 142, 147 (Tenn. 1981); State v. Jones, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981)). Regardless, the Petitioner's allegations do not entitle him to relief.

The Tennessee Supreme Court has held that trial courts should determine on a case-by-case basis whether gallery members' attire is so prejudicial that it denies a defendant a fair trial. State v. Davidson, 509 S.W.3d 156, 196 (Tenn. 2016). Buttons and t-shirts with victim's faces or names are not inherently prejudicial so long as they do not suggest or advocate the defendants' guilt or innocence. Id. According to the Petitioner's allegations, trial counsel objected to the t-shirts, and the trial court instructed the victim's family to turn them inside out. The trial court engaged in a case-by-case determination of the likely effect of the shirts and determined that its instructions were sufficient to guarantee impartiality. The record shows that trial counsel, in coordination with the trial court, thoroughly examined the jury pool for any potential bias. Trial counsel questioned the jury venire on whether they could apply the presumption of innocence and reasonable doubt standard; whether they knew the Petitioner, the victim, or other jurors; whether they had an inherent bias about domestic abuse; and whether they had a bias toward the police and their testimony. Trial counsel excused one juror for cause after he admitted to knowing the Petitioner's family and stating that the family had been in "a lot of trouble" before. On this record, the Petitioner has failed to demonstrate deficient performance or prejudice to his case. He is not entitled to relief.

## CONCLUSION

For the reasons stated above, the judgment of the post-conviction court is affirmed.

 

_____
CAMILLE R. MCMULLEN, JUDGE